## Case No. 14,417.

### UNITED STATES v. ABLE et al.

[15 Int. Rev. Rec. 41, 50.]

District Court, D. Missouri. 1872.

OFFICERS — NEW APPOINTMENT — SURETIES — OLD DEFALCATION — COLLECTOR OF INTERNAL REVENUE—LIST OF ASSESSMENTS.

1. Under the well established doctrine that where an officer becomes his own successor, he, as such successor, is to be governed by the same rules as if another person had been appointed, it is *held* that in the absence of formal receipts. the fact that the government funds were turned over so as to make the officer and his sureties under the new appointment liable, is to be inferred from what his accounts show were in his hands at the commencement of the new term, and the moneys of the second term, in which new sureties are interested, cannot be taken to pay off an old debt or defalcation with which they had no concern.

2. A collector of internal revenue should be credited with so much of the list of assessments transferred to his successor as the commissioner found he could not collect with due diligence, within the meaning of section 34 of the act of 1866 [14 Stat. 158], and he is at liberty to show that by due diligence he could not collect the same before the expiration of his term of office. or that, as to some of the items. the day prior to which they ought to be collected had not arrived. the action of the commissioner on his accounts not being final.—Ed. Int. Rev. Rec.

At law.

TREAT, District Judge. This is a suit against the principal and sureties on an official bond of Barton Able, collector of the First collection district of Missouri, for the amount of moneys alleged to be in his hands as such collector, "evidenced by a transcript of the books and proceedings of the treasury department, filed and made part of the proceedings;" which amount he has not paid on demand made. The suit is brought pursuant to the act of 1797. c. 20 (1 Stat. 512) which provides as follows:

Section 1. "That when any revenue officer, etc., shall neglect or refuse to pay into the treasury the sum or balance reported to be due to the United States upon the adjustment of his account, it shall be the duty of the comptroller, etc., to institute suit." etc.

Sec. 2. "That, etc., a transcript from the books and proceedings of the treasury certified, etc., shall be admitted as evidence,

and the court trying the cause shall be thereupon authorized to grant judgment," etc.

The 36th clause of rule 29, regulating the practice in this court, prescribes that "it shall not be necessary for a party to set forth in a pleading the items of an account therein alleged, but if they be not set forth, he shall file with his pleading, referring to it therein a copy of the account, which shall be deemed to be a part of the record, and shall be answered or replied to as such." In accordance with the spirit of that rule and the act of 1797, the petition has been framed, and the transcript of the account filed. Although this suit, under the act of 1797, is technically on the official bond, yet really it is as on an account stated, for the balance alleged to be due; and under the rulings by the United States supreme court the transcript should give at least the balances at the quarterly or other rests on a continuing account; therefore the district attorney very properly considered the foregoing rule of this court as applicable, and the defendants have in their answer treated said treasury transcript as a part of the record. The object of that rule is to compel the plaintiff to disclose on what he relies, and to give the defendant full opportunity to admit or deny, in detail, the matters charged against him—to prevent resort to common counts—and instead of driving defendants to crave oyer and move for a bill of particulars, to require of the plaintiff to file with his petition in the first instance (or give oyer), the contract or instrument on which the suit is instituted, and if the action is based on an account to file the account with the petition. This should especially be done under the act of 1797, where the transcript of the account is prima facie evidence of the amount due. Hence, as a matter of practice, the attorneys of plaintiff and defendants are substantially correct; and consequently. on the pending motion of the district attorney, which is, in substance, to strike out certain parts of the answer, the grave questions of law, so fully argued, are fairly and fully before the court. The suit is on the bond, and the transcript is relied on, as sufficient, prima facie, to establish plaintiff's right, not only to recover, but to recover the precise amount stated therein as the balance due. The defendants under the practice stated, are therefore fully advised of the matters which they have to meet. Sections 3 and 4 of the act of 1797, and the decisions of the United States thereupon, leave no room for doubt or difficulty. Thus, the United States on the one hand, and the defendants on the other, are brought to a direct issue as to their respective rights in the premises, without concealments or confusion—issues clear and positive and certain, as all issues should be where the logic of pleading obtains. .

This suit, then, is on a bond executed by the defendants February 20, 1867; but the

petition does not disclose the fact that said Able had held the same office previously and had given a previous bond. The treasury transcript, however, commences from September 1, 1866, and is continuous in its quarterly balances to the final statement of the account at the close of said Able's second term of office, May 16, 1869, the balances for each quarter and fractional quarters from September 1, 1866, to May 16, 1869, being brought forward into each succeeding quarter, regardless of the fact that there were two distinct terms of service, and two separate bonds for the distinctive terms, and also regardless of the fact that there should (so far as the sureties are concerned), have been a final rest or adjustment of the balance at the expiration of the first term of office. Although the petition does not, in the body thereof, disclose these facts, yet the transcript filed under the rule of the court does do so, and defendants avail themselves thereof. If there could be any doubt as to what the law requires in such cases, that doubt was long ago put to rest by the United States supreme court. The original and temporary appointment would have terminated, if no further action had been had, at the close of the next session of the United States senate, viz., in 1866-7. But before the close of that session the defendant Able was appointed by the president, "by and with the advice and consent of the senate," his own successor to the said office of collector, and gave the required bonds under the new appointment. Each term, therefore, was as distinct as if different persons had held the office for the respective terms. U. S. v. Kirkpatrick, 9 Wheat. [22 U. S.] 721; U. S. v. Eckford's Ex'rs. 1 How. [42 U. S.] 250. It would seem to follow, logically, and ex necessitate rei, that the rests or balances should be stated accordingly, and in the two cases just cited it was so held. Although in Kirkpatrick's Case [supra], which is the same as this in all respects so far as this point is concerned, the accounting officers considered the defendant as holding his office under what was termed a reappointment, and continuously, and therefore ran the accounts of his first term of office into the second, the United States supreme court held that such a course was not lawful; that at the close of his first term a balance should have been struck, just as if some other person had been appointed to succeed him. In no other way is it possible to determine the liabilities of the sureties on the respective bonds.

In the case of U. S. v. Eckford's Ex'rs [supra], those rulings being before the accounting officers they restated the accounts accordingly, making the proper rests and striking the balances properly. One of the questions in that case was, whether such restatements of the account were within the act of 1797, and the court held that they were. Indeed, in that case several points

were clearly decided which pertain to the questions now under consideration—decided, too, in such a way as not only to be binding on this court, but as to carry with them the fullest assent of right, reason, and sound legal judgment. The general transcript in that case, as in this, ran the accounts of one term, by quarters, into another, without reference to the fact that the terms of office expired in the middle of a quarter; whereby the general transcript gave no balance or rest for a distinctive term of office, and without reference also to the fact that uncollected revenue bonds, etc., might still be in the hands of the collector. The court, therefore, said: "From this, it appears that the general transcript affords no sufficient data on which to charge the sureties for any term of office, where, as in the present case, the same person has served as collector for several terms." That case, and the earlier case of Kirkpatrick, as well as the laws concerning accounting, determine that the United States, when plaintiff, must make out its case by competent evidence, and that the treasury transcript is prima facie evidence of the balance due, as to all items which arise in the ordinary course of treasury transactions with a collecting or disbursing officer; yet, that the plaintiff must present such a treasury transcript as will enable the jury to determine what was due for the precise term for which the bond was given. How can the jury, with no other evidence before them than the transcript in question, determine what was the state of the accounts between the United States and the defendant Able on February 20, 1867, or since? The case of U. S. v. Bruce, 17 How. [58 U. S.] 449, does not change the rule. In the report of that case, it is not stated whether the balance was struck for the close of the antecedent term of office; yet it is inferable that such was the fact. The doctrine then enunciated is simple enough, and evidently just, viz.: That when an officer becomes his own successor, he, as such successor, is to be governed by the same rules as if another person had been appointed—a doctrine laid down in all preceding cases. Thus, if at the close of his term of office, a collector, in accordance with law and treasury regulations, turns over to his successor moneys, bonds, etc., he should, as a general proposition, be credited therefor and the successor charged therewith. The successor and the sureties on his official bond are liable for such successor's action, with respect to the moneys and bonds so received by him. So, when the same person is again appointed, and he has not taken a receipt from himself as successor in favor of himself as predecessor, and it is shown by the treasury balance that there were in his hands certain moneys, etc., as he passed from the one term of office into that next succeeding, it was properly held that the amount in question did come to his hands in the second term, just as if he had passed formal receipts therefor from himself to himself. Hence, that

court said, when the treasury transcript shows that such balance struck was in his hands at the time he passed from the old to the new official term, the burden was on the sureties to the last bond to prove that, although the treasury transcript (which is prima facie evidence), indicated that he did receive in the new term what was in his hands at the close of the old term, still that indicated fact or prima facie case was not correct, because he had really misapplied previously the funds which seemingly were then in his hands. If a preceding collector turns over funds to his successor, the latter and his sureties are liable therefor. How is it to be proved that the funds were turned over? When different persons fill the office for the respective terms, the receipts given show the fact; but when the same person fills both terms and no formal receipts pass, the fact is to be inferred from what his accounts show were in his hands at the commencement of the new term. The doctrine in Bruce's case is thus simple enough.

In the case now before the court the transcript does not show what was in the defendant's (Able's) hands at the close of the first term, and consequently with what precise sums he is chargeable under the second bond. Then, again, another difficulty arises as to the appropriation of payments made by him during the second term. The manner in which the account is made out, is insufficient for that purpose. The debtor, it is true, may, ordinarily, make his own appropriation of payments, and when he fails to do so, the creditor may elect; and in the absence of any appropriation made by the debtor or creditor before suit is brought, the court will so appropriate the payments as to work out justice to all concerned. But that general rule the supreme court has rightly held as not applicable to sureties under different official bonds, for obvious reasons. It says: "The rule adopted in ordinary cases is not applicable to a case where different sureties under distinct obligations are interested." The reason is this: A public officer acting under an official bond with certain sureties is liable, together with his then sureties, for his conduct during the term to which that bond applies. If at the close of that term, he is a defaulter—say for $100,000—his sureties are held therefor. Should he enter upon a new term, under a new bond with different sureties, he cannot take the moneys belonging to the new term and apply them to the payment of his defalcation during the previous term, nor can the United States do so, and thus shift the obligations of the first sureties from them to the second sureties, or in other words, take the moneys of the second term in which the sureties are interested to pay off an old debt or defalcation with which they have no concern. The last sureties are liable only for the payment to the United States of the moneys received by their principal during the last term, and cannot by a misappro-priation of the sums paid be thus mulcted for defalcations or obligations never incurred during the term for which they are liable. But the modes of accounting, as prescribed by the internal revenue act, although differing in some details from those indicated by other acts of congress, are essentially the same, and therefore the foregoing doctrines are equally applicable to each class of cases. Collectors of customs may have uncollected bonds, etc., in their possession at the expiration of their terms of office, for which they must account; and the modes of accounting therefor are sufficiently explained in the acts of congress and the decisions of the supreme court. See cases cited ante, and [Hoyt v. U. S.] 10 How. [51 U. S.] 109.

Section 34 of the act of 1864 was changed by the act of July 13, 1866, the latter being applicable to this case. In the act of 1866, § 34 (14 Stat. 110), as amended, reads: "That each collector shall be charged with the whole amount of taxes, whether contained in lists delivered to him by the assessors, respectively, or delivered or transmitted to him by assistant assessors from time to time, or by other collectors (or by his predecessor in office), and with the additions thereto, with the par value of all stamps deposited with him, and with all moneys collected for passports, penalties, forfeitures, fees, or costs, and he shall be accredited with all payments made into the treasury as provided by law, with all stamps returned by him uncancelled to the treasury, and with the amount of taxes contained in the lists transmitted in the manner above provided to other collectors, and by them receipted as aforesaid, and also, with the amount of the taxes of such persons as may have absconded or become insolvent prior to the day when the tax ought, according to the provisions of law, to have been collected (and with all uncollected taxes transferred by him or his deputy acting as collector to his successor in office:) provided that it shall be proved to the satisfaction of the commissioner of internal revenue that due diligence was used by the collector. (these words in act of 1864 are omitted in act of 1866, 'and that no property was left from which the duty or tax could have been recovered,') who shall certify the facts to the first comptroller of the treasury. And each collector shall also be credited with the amount of all property purchased by him for the use of the United States, provided he shall faithfully account for and pay over the proceeds thereof upon a resale of the same as required by law. (In case of the death, resignation or removal of the collector, all lists and accounts of taxes uncollected shall be transferred to his successor in office as soon as such successor shall be appointed and qualified, and it shall be the duty of such successor to collect the same.)" The parts in brackets were inserted in the act of 1866, as to the transfer of uncollected lists; whereby the successor was to be charged therewith

and the predecessor credited, and whereby it became the duty of the successor to collect the same. Those amendments necessarily involved a change in the mode of accounting. It should be remembered that section 35 permits, as in previous acts concerning revenue officers, warrants of distress to issue for the amount found due on balances struck at treasury department. Pursuant to the act of July 13, 1866, applicable to these accounts, defendant Able is charged with the list of uncollected taxes received by him from his predecessor, but he is not credited with the list of uncollected taxes transferred to his successor or with any part thereof. It is stated in the argument that the commissioner's instructions issued under the act of 1864 have been continued in force, and applied to the act of 1866, just as if the statute had not been changed. How that may be does not appear on this motion, in such a way as to authorize judicial notice thereof. It is evident that congress had its attention called to the deficit in the act of 1864, and endeavored to remedy it in the act of 1866; and that thereafter the system of accounting ought to have conformed to the positive requirements of the amended law. The act of 1866 is as important to the revenue interests of the country as to the protection of public officers. An outgoing collector may have had placed in his hands a list of taxes for collection a few days before the expiration of his term of office, and the time in which they "ought, according to the provisions of law, to have been collected," may not have terminated when it became his duty to turn the same over to his successor, and take the latter's receipt therefor. And in this case it appears that such a list was received by the collector within a month of the close of his official term. Whatever difficulty may exist as to the true construction, in some respects, of section thirty-four, as amended by the act of 1866, there ought to be no doubt that the section in question contemplates that the outgoing collector shall be credited with a list of such uncollected taxes transferred to his successor, as the law did not require to be collected previously. The acts of congress contain various provisions, not only as to the times, but as to the modes of collecting taxes, and also as to penalties and forfeitures. Hence, at the expiration of a term of office, there may be many taxes not yet collected, because not yet collectible; there may be many suits pending for penalties, forfeitures, etc.—also, other proceedings pending whereby the payment of taxes is to be secured or enforced. The embarrassment consequent thereon in a final adjustment of the outgoing collector's accounts may be very great, unless some just and uniform system is adopted and pursued in the accounting department. So far as congress has prescribed the rule, it must be followed, and any instructions or rules inconsistent therewith are invalid. From the letter of the statute, as cited above, the successor in office is charge-

able with the tax list transferred to him by his predecessor for collection, and it is made the duty of the predecessor to transfer "all lists and accounts uncollected," and of the successor to collect the same. If no other provisions of section 34 are considered, the rule for accounting would be very simple, viz.: the outgoing collector would transfer to his successor "all lists and accounts uncollected," and receive credit therefor—just as he had been previously charged with such lists and accounts transferred to him by his predecessor. His successor, then, being charged with what was so transferred, would have to account therefor. Thus the accounts of the outgoing collector could be speedily settled. But if he is not, despite the act of 1866, to be credited at once for the transferred lists and accounts, but only with the amounts from time to time collected by his successor, and as they are collected; and if consequently his liabilities and those of his sureties are made to depend on the diligence of his successor, over whose conduct they have no control, then he and his sureties are to be held responsible, not for his faithful discharge of duty, but for the faithful discharge by his successor of the duties devolved solely on the latter; for section 34, under the act of 1866, devolves on the successor the duty of collecting the uncollected lists transferred. The act evidently contemplates the speedy adjustment of accounts with each collector. As one succeeds another, and uncollected demands may be still outstanding which ought to be collected, the law provides that the outgoing collector, instead of retaining in his hands the uncollected lists for the purpose of enforcing the collection of the same, and instead of waiting also for the termination of suits or other pending proceedings, shall give place to his successor, who shall from his entrance into office be charged with the completion of the unexecuted duties of his predecessor. If full and correct lists in detail are transferred, as the act contemplates, there will cease to be either confusion or divided responsibility, and the accounts can be readily adjusted and closed. For illustration, by the act of September 24, 1789 [1 Stat. 73], United States marshals, after the expiration of their terms of office or removal, have power to execute all precepts in their hands, but the internal revenue acts are framed to prevent a predecessor in a collector's office from collecting taxes after his term of office has ended. It is obvious that the policy thus enacted is not only wise, but essential to the prompt and methodical collection of revenues; and to the due responsibility which should attach to those, respectively, who are charged with such important trusts. It is also important that the transition in office should not work an interruption in the accounts of the government, or a delay in collections and settlements.

While such seems to have been one of the main objects of the amended section, and a

guide is thereby furnished to the accounting officers, yet there is another and equally important question to be determined. The section states what shall be charged to the successor, but is not equally explicit as to what shall be credited to the predecessor. It would seem that for accuracy in accounting, the predecessor in transferring his uncollected lists should be credited therewith, if his successor is charged with them; otherwise there may be a double charge for the same accounts on the treasury books. It is said, as above-mentioned (and a circular to the same effect is produced), that the old system of regulations under the act of 1864, is still continued, whereby the defects of the act of 1866 were designed to be remedied in these respects. How that may be is not known to the court, nor can it be now determined whether such a system is wiser than the law, for it must suffice that courts must hold the wisest course to be the lawful course—that no other course, or rather that no course, inconsistent with that prescribed by law, is permissible.

But what is the course prescribed by law? While section 34 states what shall be charged to the successor, and what his duty shall be as to the transferred lists, it only provides concerning credits to be given to the predecessor (so far as the point under consideration is concerned), as follows: "And also with the amount of the taxes of such persons as may have absconded or become insolvent prior to the day when the tax ought, according to the provisions of law, to have been collected, (and with all uncollected taxes transferred by him, or by his deputy acting as collector, to his successor in office): provided, that it shall be proved to the satisfaction of the commissioner of internal revenue that due diligence was used by the collector, who shall certify the facts to the first comptroller of the treasury." The whole of this section has been previously quoted and reference made to the parts thereof amendatory of the act of 1864. As seen, the act of 1864 made no provision with respect to the uncollected lists in the hands of the outgoing collector, and the amendments with regard thereto in the act of 1866 are interjected into the former act in such a way as to create doubts and difficulties concerning the true interpretation of what the commissioner should certify. The collector is required to return his accounts to the commissioner, and the section prescribes what shall be charged against him. Do the words, "who shall certify the facts to the first comptroller of the treasury," refer only to the opinion of the commissioner on the question of "due diligence," or to all the facts connected with the collector's accounts? There is nothing in the section whereby, in express terms, the accounts in the commissioner's office are to be sent to the first comptroller, unless the clause quoted so requires. True, there are other statutes concerning the treasury department, bearing on the subject, from which

such a duty might be inferred; but the present object is to ascertain what section 34 exacts, in order to determine for what an outgoing collector and his sureties are liable, and what treasury transcript of his accounts shall be prima facie evidence against them, and what they are permitted to prove by way of credits. The "due diligence," under the act of 1864, was with reference to absconding and insolvent debtors; and is it now to be held to apply to all uncollected taxes, irrespective of the previous limitation to absconding and insolvent debtors? Such seems to be the true meaning of the act, not from the collocation only, but from the whole tenor of the section, as fully shown not only from its detailed requirements and the objects to be accomplished (the evil and the remedy), but also from other statutes in pari materia; and therefore the outgoing collector is to receive credit for only so much of the uncollected list transferred to his successor, which ought to have been previously collected according to the provisions of law, as he can prove to the satisfaction of the commissioner that he had used "due diligence" to collect. Still, if that be the true construction, the same rule of interpretation should apply to the charge to be made against his successor. Thus, if out of a list of $100,000 uncollected taxes to be transferred, the commissioner holds that the outgoing collector can receive credit for only $50,000 in consequence of lack of due diligence, and the successor is notwithstanding charged with the $100,000, does not $50,000 thereof stand charged twice on the books of the treasury? And further, if suit is brought on the bond of the outgoing collector, charging him with the $50,000 not collected through lack of diligence, and his successor collects and pays into the treasury every dollar of the rejected $50,000, shall the transcript originally filed as prima facie evidence against the outgoing collector and his sureties be the basis of the judgment to be rendered, exclusive of any proof that the $50,000 have been collected by his successor and paid into the treasury? Under the act of 1797, he cannot be permitted to prove, for the purpose of reducing the treasury balance named in the transcript, any items of credit except such as were previously submitted to the treasury officers and were by them disallowed, and, therefore, if he is not to be credited with what he has transferred to his successor, except where due diligence has been proved to the commissioner's satisfaction, and the judgment of the commissioner is final with respect thereto—then the outgoing collector and his sureties must pay the $50,000, although the same is already in the treasury. On such a theory the $50,000 would be recovered—whatever the form of suit used—rather as a penalty for lack of due diligence. This raises the distinct question presented in the argument: "Is the decision of the commissioner on that point final?" The

rule under the act of 1797 makes the transcript prima facie evidence, but allows the defendant to prove such disallowed credits as he is legally entitled to receive. Such must be the rule in this case unless section 34 establishes a new rule with respect to the accounts of internal revenue collectors. There is no express repeal of the old rule to be found in section 34 of the act of 1866; nor does this court discover any such repugnancy between the two acts, as works a repeal of the former. They are entirely reconcilable and consistent with each other. Under the old and new acts concerning revenue officers, warrants of distress may issue on balances struck, and the character of such proceedings was fully discussed and settled in Murray's Lessee, 18 How. [59 U. S.] 272. It is in the power of congress thus to enforce such revenue demands, without leaving them open to review by judicial tribunals; but when resort is had to judicial tribunals, as in this case, then the requirements of law are to be fully considered, and the action of the treasury officers to be subjected to review in the light of the law and facts applicable to the case made.

Without analyzing the various analogous acts of congress, it must suffice to call attention to the act of March 3, 1791 (1 Stat. 199), and of July 22, 1813 (3 Stat. 22). The twenty-seventh section of the latter act provides: "That each collector shall be charged with the whole amount of taxes by him receipted, whether contained in the lists delivered to him by the principal assessor or transmitted to him by other collectors, and he shall be allowed credit for the amount of taxes contained in the lists transmitted in the manner above provided to other collectors and by them receipted as aforesaid; and also for the taxes of such persons as may have absconded or become insolvent, subsequent to the date of the assessment and prior to the day when the tax ought, according to the provisions of this act, to have been collected; provided it shall be proven to the satisfaction of the comptroller of the treasury that due diligence was used by the collector, and that no property was left from which the tax could have been recovered," etc. It will be seen that the act of 1813 was nearly the same as the act of 1864, and made no provision for lists of uncollected taxes transferred to successors in office. It will also be observed that the proof of due diligence was to be made to the comptroller. No case has been found which determines whether the action of the comptroller in admitting or rejecting a credit under the requirement of due diligence, was held to be final, or open for review under that act. It would seem that the substitution in the acts of 1864 and 1866 of the commissioner of internal revenue for the comptroller, does not work any change in the rule; nor is there aught in any of the several acts of congress which makes one act of an accounting officer as to adjusting accounts of more obligatory force than another. If his rejection of an item of credit claimed on one ground is open for review, why not, when another item is based on another ground? Is there any distinction to be found in the acts of congress or in the reasons on which they are founded which makes the comptroller's or commissioner's ruling on one item of credit more authoritative than his ruling on another? A revenue officer submits his accounts for audit, and some of the credits claimed by him are disallowed. He is permitted, when sued on his bond, to show that the disallowed items are just and lawful. Now, if the disallowance on the transferred lists is because the commissioner was not satisfied that due diligence was used for their collection, is the defendant to be precluded from showing that they were wholly uncollectible, or that they have been since collected by his successor and paid into the treasury? There is not, in the opinion of this court, any distinction of the kind; and the defendant is at liberty to show that according to the requirements of law he transferred the uncollected lists; that he could not prior to their transfer collect the same, etc.; in short that, under the law, he did what his official duty demanded, and having so done, he presented said amounts as credits to the proper accounting officers, who disallowed the same. In brief, this court holds that the action of the commissioner thereon is not final and conclusive; that his action could be reviewed by the comptroller, and may be reviewed in court under the act of 1797. The introduction of the internal revenue system, and the provisions whereby its affairs are primarily entrusted to a new bureau in the treasury department, did not make that bureau an independent department and detach it from the ordinary laws and regulations controlling the revenues of the country. The matters immediately pertaining thereto, that bureau was to control in the first instance; and instead of having the accounts of its officers pass primarily into an auditor's office, without the cognizance of the commissioner, the law demanded that those accounts and the conduct of the internal revenue business generally should be under the primary supervision of the commissioner. It may be that in some matters his decisions are final; but whether so or not, the point now to be decided is whether his accounting is final; whether no one, comptroller, secretary of the treasury or the courts can go behind his action, and review the same in the light of law and testimony. That it is in the power of congress to vest such authority in treasury officers is fully settled in the Case of Murray's Lessee; but that it has not, for the purposes of this case, vested any such final authority in the commissioner or comptroller is evident for reasons already stated.

As to the proper application or appropriation of payments during the second official

term, sufficient has been said, under the decisions of the United States supreme court, to show that such subsequent payments are to be appropriated as follows: All sums collected on accounts transferred from the preceding term are to be applied to those accounts, and all sums collected on other accounts or lists coming to the collector's hands must be applied to the latter. In other words, because Able was his own successor, moneys collected by him from lists coming to him, not from his predecessor, cannot, when paid, be applied to the payments of debts due from his predecessor, whether he or some one else was that predecessor. What collections and payments were made by him on his predecessor's transferred accounts or lists must be applied to them, but all other collections and payments must be applied to the subsequent accounts and lists to which they have reference. There can be no misappropriation, either by Able or the United States, of payments due to the respective official terms whereby the rights of parties under the different bonds can be prejudiced. Hence the portions of the answer objected to, under this head, indicates the main difficulty with respect to the transcript. It sets out that the collector is charged in the transcript as balance due December 31, 1866, $233,155 95, and with amounts of assessors' lists for said December and January following, $478,516 74; and for beer stamps during the months of January and February, 1867, $43,254 36—a sum, it will be perceived, equal to $754,927 54, and that said sum total is made to counterbalance payments made after the new bond of February 20, 1867, was given. The answer thus avers that of the payments made after the new bond was given, an illegal appropriation to that amount was made in discharge of obligations incurred under the prior bond. It does not so state with the precision which would have been necessary if the transcript had been made out with reference to the close of Able's first official term, but it is as precise as the transcript enables it to be. If the transcript had been made out as it should be, with the balance struck at the close of the first term, then the answer should have specified what payments made during the second term were of sums collected on lists of the prior term; so that legal appropriation of the payments could be made. But the answer is as definite and precise as the petition and transcript enable it to be. The answer is, to a large extent, drafted on the hypothesis that under the rules of practice in force in this court the defendants can treat the treasury transcript as a part of the petition or declaration, which hypothesis this court holds to be substantially correct. Although the instrument formally sued on is the bond, yet the recovery thereon is based on the treasury transcript under the act of 1797, and the amount of the recovery is dependent on the accuracy or inaccuracy of that transcript. From the views expressed, it is evident that the defendants have gone further in their defence than might have been technically necessary; yet it is well that they have done so, because they have thus enabled the district attorney to elicit, by motion, the opinion of the court on the several difficult, yet important questions of law, on which the case would have turned, were the same now before a jury. Were the case now on trial before a jury, or before the court without the intervention of a jury, the court would have to rule that the treasury transcript is admissible in evidence, but would have also to rule that it furnishes insufficient data on which to charge the defendants. [U. S. v. Eckford] 1 How. [42 U. S.] 250. It would also have to rule that the appropriations of payments must be made in accordance with the principles stated. How to ascertain what is due under the second bond sued on, there is "no sufficient data." The account should be restated at the treasury department in accordance with the requirements of law, as interpreted by the repeated decisions of the United States supreme court. That rule was determined substantially as early as Kirkpatrick's Case, and was more fully enforced in the Case of Eckford's Ex'rs. If not so restated, the mass of evidence to supply its defects will serve only to confuse a jury.

Under the act of 1866, Able is charged with the lists of his predecessor transferred to him. It does not appear whether he is so charged with the sum total of said lists, respective or irrespective of the question of due diligence. He is not credited with any part of the lists by him transferred to his successor. This court holds that he should be credited with so much of the list transferred to his successor as the commissioner found he could not collect with due diligence within the meaning of section 34 of the act of 1866. As to the residue of that list for which he received no credit, and for which it is said he demanded credit before suit was brought, and which demand was disallowed, he will be at liberty at the trial to show that by due diligence he could not collect the same before the expiration of his term of office, or that, as to some of the items, the day prior to which they ought to have been collected had not arrived. There may be, for aught that is known to the court, many suits instituted by him for the enforcement of demands not yet determined, and large sums of moneys collected under the transferred lists by his collector, the benefits of which he is entitled to receive.

It is of vast moment to the United States that the collecting and disbursing officers should be held to rigid accountability, and it is equally important that the laws should be so enforced as at all times to show for what they are accountable. If the accounts are so kept as to show the true balance, the

judgment of the courts will be as speedy as the trials will be brief; but if the accounts do not conform to the acts of 1797 and of 1866, in cases like the present, the trial may be so protracted as to work vast injury to the United States on the one hand, and the defendants on the other, whatever may be the final result. Hence, this court has, as a guide to the trial, expressed in detail what it holds the rules of law to be, which must control the ultimate decision of this cause. It is desirable that the merits should be reached; and that if any sum be due to the United States, it should be recovered. It is also desirable that revenue officers should be held to a prompt and diligent settlement of their accounts. It is still more desirable that such clear and definite rules of law should prevail, as will insure fidelity and diligence and accuracy on the part of all connected with the public revenue.

The accounts in this case purport, on their face, to be, in large part, for sums claimed to be due under two bonds, without discrimination as to what is due under one or the other, and therefore furnish, in the language of the United States supreme court, no sufficient data on which a judgment can be rendered. Thus on the face of the account No. 5,559, "Supplemental for Suit," there is stated as due "under bond dated August 21, 1866, renewed February 20, 1867," the sum claimed in this suit. There is no such "renewed" bond. What is due under each of the bonds respectively does not appear. In the "statement of differences" credits appear for collections made by the successor in office, and also an explanatory note that several of the differences "arise in consequence of the collector's failure to render his account for the period from January 1, 1869, to May 16, 1869," when his official term ended. Thus, as late as February, 1871, no return by the collector for the period last named had reached the fifth auditor's office. How this occurred is not known to the court—whether the collector was guilty of the gross neglect not to make the required return for so long a time as indicated, or whether a return was sent to the commissioner's office and there remained awaiting final action. It is to be inferred, perhaps, from the manner in which the account is finally stated, that Able is credited only on uncollected taxes for what his successor had collected on transferred lists; and he still stands charged with the whole amount of the lists delivered to him originally, without abatement, except as mentioned in previous quarterly adjustments. It is apparent that for the lists delivered to him after December, 1868, no abatement has been made under the proviso in section 34; and, if he made no return subsequent to that date, there evidently could be no such abatement. He would not have returned even the fact of the transfer of uncollected lists to his successor, and of course would not have furnished any data on which credits were allowable thereunder. What the precise facts are has not as yet been disclosed to the court; but, as it is important, so far as practicable, to settle in advance the rules by which the parties are to be governed at the trial, it may be as well to remark now that, if no such return was made, there could have been no legal claim for credits, and consequently no proofs with reference thereto can be received, except in accordance with section 4 of the act of 1797, viz.: "That he is at the time of trial in possession of vouchers not before in his power to procure, and that he was prevented from exhibiting a claim for such credit at the treasury by absence from the United States or some unavoidable accident."

It is the obvious design of the various laws on this subject to hold revenue officers to a strict and prompt accounting with the treasury department, and not permit them in any, save the exceptional instances named, to first set up in the courts, after suits brought, claims for credits. Their duty exacts prompt accounting; and it is only when they and the department disagree as to some matter distinctly presented and considered at the department that the courts can review the question. Were this not so, the auditing and adjustment of accounts would fall mainly on the courts, the revenue of the country be involved in litigation, and the resources of the treasury be withheld from the daily recurring wants of the government. The doctrines in Murray's Lessee, 18 How. [59 U. S.] 272, fully explain that only such questions in accounting as the acts of congress permit can be heard in the courts.

But the point is made in the argument that the breach of the bond, as to uncollected taxes, should not be for the failure to pay over money, but for not diligently or faithfully performing the duty to collect within the prescribed time. That technical distinction is of no avail under the act of congress. The system of accounting is prescribed, and each list of taxes delivered is to be charged as a money demand. The credits given are on the same basis, as, for instance, for uncollected taxes from absconding and insolvent debtors. The balance struck on the treasury books is for money thus charged, and it is immaterial whether it was money actually put into the hands of the officer for disbursement or money's worth placed in his hands to be accounted for. The collector must pay into the treasury the amounts for which the lists call (as it his duty to collect them and pay them over), or he must show that by due diligence he could not collect them, and thus secure a credit by way of abatement. His accounts, presented and audited on such a basis, will through the "statement of differences" show, generally, wherein he and the accounting officers disagree. When suits are

instituted on official bonds, the courts will be confined to such "differences," except, as before mentioned, under section 4 of the act of 1797. That there may be no misunderstanding, attention is called to the "statement of differences," "supplemental for suit." The defendant, Able, claims for credits presented and disallowed; and the treasury transcript should show such disallowances. How far, in the absence of such disallowances appearing in the treasury transcript, the defendant will be permitted to go is a grave question. He should not be precluded from showing the fact, if it exists, although the transcript is silent on the subject. As to the extent or sufficiency of proofs, it will be for the court to rule when the question arises. If he made no return, the question is closed. He cannot withhold a return, and yet claim credits. He must present his accounts, debit and credit, and not forward a demand for credits without making the full return exacted by law. If he has made the full return, and charges appear which he disputes, or credits have been thus legally claimed which were disallowed, then as to those items the court will hear evidence; but it will not hear evidence as to any other items, unless they fall within the fourth section of the act of 1797. Hence, if the account is restated, there will be no difficulty in ascertaining precisely what are the items in dispute. If the defendant, Able, claims credits for items not in the statement of differences, it will have first to be shown that he made the proper return and claim therefor. By reference to the restatement, when made, the issues can be exactly framed so as to leave no doubt as to the items in dispute. The motion to reform is overruled.